# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| JANICE SUSAN DOUGLASS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | **Case No. 09 C 855** |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security, | ) | **Magistrate Judge Young B. Kim** |
| | ) | |
| Defendant. | ) | **June 29, 2010** |

## MEMORANDUM OPINION and ORDER

Before the court is the motion of plaintiff Janice Susan Douglass ("Douglass") for summary judgment. Douglass seeks review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for a period of disability and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. § 423(d)(2), and Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1382c(a)(3)(A). Douglass asks the court to reverse the Commissioner's decision and award benefits, or in the alternative, remand the decision for further proceedings. For the following reasons, the motion is granted to the extent that the cause is remanded for further proceedings consistent with this opinion.

### Procedural History

Douglass applied for DIB and SSI on July 22, 2005, alleging that she became disabled on October 29, 2003, due to a back disorder, carpel tunnel syndrome, severe depression, and anxiety. (Administrative Record ("A.R.") 51, 66-68, 631-33.) Her applications were denied

initially on November 25, 2005, and again on reconsideration on May 25, 2006. (Id. at 11, 49-53, 625-28.) Thereafter, Douglass filed a timely request for a hearing on July 3, 2006. (Id. at 47.)

An administrative law judge ("ALJ") held a hearing on July 22, 2008. (A.R. 634-93.) Douglass appeared and testified at the hearing. (Id. at 636-84.) Dennis Gustafson ("Gustafson"), a vocational expert, and Kevin Spencer ("Spencer"), a witness for Douglass, also appeared and testified at the hearing. (Id. at 684-92.) On August 25, 2008, the ALJ issued a decision finding Douglass not disabled. (Id. at 11-23.) In reaching his decision, the ALJ relied on medical evidence showing that Douglass had no abnormal findings, but ignored medical evidence that supported her disability claim.

Douglass then filed a request for review of the ALJ's decision and, on November 26, 2008, the Appeals Council denied her request, making the ALJ's decision the final decision of the Commissioner. (A.R. 4-6.) Pursuant to 42 U.S.C. § 405(g), Douglass initiated this civil action for judicial review on February 19, 2009, of the Commissioner's final decision.[1]

_____

[1] Under 42 U.S.C. § 405(g), an individual who wishes to obtain judicial review of an adverse decision of the Commissioner must file a civil complaint within sixty days after the Appeals Council denies review. "The 60-day requirement is not jurisdictional, but rather constitutes a period of limitations." *Bowen v. City of New York*, 476 U.S. 467, 478 (1986) (citations omitted). Here, Douglass filed an affidavit with the court testifying that she did not receive notice of the Appeals Council letter until January 8, 2009. Thereafter, she filed a civil complaint on February 19, 2009. Because the Commissioner did not assert a statute of limitations affirmative defense in its answer or in its responsive brief, that defense has been waived. Fed.R.Civ.P. 8(c) (requiring a defendant to plead a statute of limitations defense and any other affirmative defense in the answer to the complaint); *Venters v. City of Delphi*, 123 F.3d 956, 968 (7th Cir. 1997) ("A claim that the statute of limitations bars a lawsuit is an

## Facts

Douglass was born on March 29, 1959, and was 49-years old at the time of the administrative hearing. (A.R. 638.) She finished eighth grade, but never went to high school or obtained a general equivalency diploma. (Id. at 642.) Douglass was most recently employed as a lead scale worker at Illinois Laundry. (Id. at 21, 86, 113, 415.) Her main duties entailed pushing, pulling, and maneuvering large carts of laundry material weighing between 150 to 500 pounds onto large floor scales, and cataloging the contents of the carts. (Id. 218, 674-75.) She stopped working at the end of October 2003, because she was suffering from back, hip, leg, and neck pain, bilateral carpal tunnel syndrome, depression, and anxiety. (Id. at 21, 113, 644.)

### A.    Physical Impairments

#### 1.    Neck and Back Pain

The record establishes that Douglass initially sought treatment for neck, hip, leg, abdomen, and lower back pain on October 29, 2003. (A.R. 185.) A November 3, 2003, x-ray of Douglass's pelvis and left hip showed degenerative disease of the spine and the radiologist incidentally noted that there were "severe degenerative changes at the L5-S1 level." (Id. at 122.) The reviewing doctor noted that Douglass's pain emanated from the L5-S1 level and referred her to physical therapy. (Id.)

---

affirmative defense, and it must be pleaded or it will be considered waived.") (citations omitted).

Two months later, Douglass was treated by Dr. William Olivero, a neurosurgeon.[2] (A.R. 213.)  Her physical examination showed her range of motion and reflexes were normal, but there was tenderness in her left groin.  (Id.)  The results of a magnetic resonance imaging ("MRI") scan of Douglass's pelvis, on January 22, 2004, showed no abnormalities.  (Id. at 118.)  However, an MRI of Douglass's lumbar spine performed three weeks later showed central canal stenosis at L2-L3 and marked narrowing of the left neural foramen at L3-L4. (Id. at 116.)

In May 2004, Douglass had an initial pain management consultation with Dr. Maria Pilar-Estilo, a pain specialist.  (A.R. 376-77.)  Treatment notes indicate Douglass reported she had continuous left flank and left lower abdominal pain, which started nine months earlier with no specific triggering event.  (Id. at 376.)  Douglass told Dr. Pilar-Estilo that her sleep was interrupted due to pain and that she took Tylenol #4 four to five times a day to relieve her pain.  (Id.)  Douglass also underwent two MRIs that month.  The first, taken of Douglass's thoracic spine, showed an incidental finding of a moderate to large sized C5-C6 disc protrusion with possible cord impingement, signifying a herniated disc and a smaller disc protrusion at the C6-C7 level.  (Id. at 373-74.)  The second, of Douglass's cervical spine, showed a central to right posterolateral C5-C6 herniated disc, and partial left C5-C6 postarthritic neuroforaminal stenosis secondary to osteoarthrosis.  (Id. at 368.)

---

[2]  Dr. Olivero performed lumbar spinal surgery on Douglass in 1992.  (A.R. 475-76.)  The surgery consisted of a lumbar laminectomy and diskectomy at L4-L5 on the left side.  (Id.)

In June 2004, Douglass saw Dr. Pilar-Estilo for left hip pain and mild pain in her neck radiating to the lateral aspect of her right arm. (A.R. 363-65.) Douglass's examination that day showed no abnormalities, but she continued to seek treatment with Dr. Pilar-Estilo for severe neck, hip, and back pain on many occasions in 2004 and 2005. (Id. at 255, 257, 259, 261, 263, 271, 303, 308, 310, 348, 359, 361.) During this period, Douglass had a series of lumbar epidural steroid injections (id. at 257-58, 259-60, 261-62, 359, 361, 362, 364), and was prescribed various medications, including Ultracet, Naproxen, and Darvocet for pain, and Effexor for depression (id. at 261-62, 303-04, 310, 359, 361, 362, 363, 364). Douglass also engaged in a physical therapy program for her back pain. (Id. at 265-70, 273-79, 283-85, 289-91, 296-97, 301, 315-19, 321-23, 325-26, 328-31, 333-36, 342-45, 347, 351-58). The physical therapy included soft tissue mobilization, ultrasound therapy, electrical stimulation, traction, hot and cold packs, and therapeutic exercises. (Id.) Dr. Pilar-Estilo's diagnoses included acute posterior neck pain, chronic lower back pain, mid to lower thoracic spine degenerative joint disease, a moderately enlarged C5-C6 disc protrusion, lumbar central canal stenosis at L2-L3, and depression. (Id. at 255, 257, 259, 261, 263, 271, 303, 308, 359, 361, 363.)

From June 2006 through April 2007, Douglass sought treatment for severe back pain from Dr. Jyoti Karla, a pain specialist. (A.R. 463-68.) Dr. Karla prescribed intervertebral differential dynamics ("IDD"), ultrasound, and transcutaneous electrical nerve stimulation ("TENS") therapies for Douglass's back pain. (Id. at 458.) Dr. Karla also prescribed

physical therapy, Vicoden, pain patches, and other medications for Douglass's back pain during this period.  (Id. at 457, 463-68.)

Douglass had another MRI of her lumbar spine in November 2006.  (A.R. 243-44.) The results showed mild to moderate lumbar spondylosis without significant central canal stenosis, and narrowing of the L3-L4 and L4-L5 neuroforamen.  (Id. at 244.)  The MRI also revealed post-operative changes of the L5-S1 intervertebral disc with anterior epidural scarring that encircles both S1 nerve roots.  (Id.)  There was no recurrent or residual disc protrusion.  (Id.) On that same day, Douglass had an x-ray of her lumbar spine, which showed mild to moderate lumbar spondylosis with moderate to severe L5-S1 disc degeneration.  (Id. at 245.)  The following month, Douglass sought emergency medical treatment for pain on the left side of her neck and shoulder that had persisted for three to four days.  (A.R. 237-39.)  Her treating physician  diagnosed the problem as torticollis (twisted neck) and prescribed medication for her treatment.  (Id. at 237.)

In March 2007, Douglass underwent another MRI and x-ray of her cervical spine. (A.R. 233-35.)  The MRI revealed an overall stable appearance of a posterior disc bulge at the C5-C6 level with narrowing of the spinal canal to 7.4 millimeters and flattening of the spinal cord.  (Id. at 233.)  A partial left neuroforaminal narrowing at the C5-C6 level was noted.  (Id.)  The x-ray showed a curvature, reversal lordosis, and degenerative changes as well as longstanding calcification adjacent to the anterior inferior aspect anterior arch of C1. (Id. at 135.)

## 2.    Wrist and Hand Pain

Douglass first sought treatment for her wrist pain on October 29, 2003.  (A.R. 185.)

An electromyography ("EMG") and nerve conduction study of Douglass's hands performed

in November 2003, showed "mildly abnormal" findings that were "most likely consistent

with a mild distal right median nerve neuropathy at the wrist level, probably consistent with

a mild right carpal tunnel syndrome."  (Id. at 178.)  The next month, Dr. Keith Rezin, an

orthopedic surgeon, diagnosed Douglass with right carpal tunnel syndrome by history.  (Id.

at 438.) Dr. Rezin opined that Douglass could be on light-duty work restrictions, and ordered

physical therapy.  (Id.)

Douglass had an independent medical examination, in August 2004, with Dr. John

Fernandez, an orthopedic specialist. (A.R. 216-28.) Douglass reported that she began having

discomfort in her hands and wrists in April 2003. (Id. at 216.)  Douglass complained of

numbness and tingling affecting the thumb, index, and middle fingers, and her symptoms

became worse with any significant activity, including forceful gripping or grasping.  (Id. at

217.)  She rated the severity of her symptoms as a seven out of ten.  (Id.)  An examination

of her hands showed paresthesias affecting the median nerve distribution on the hands with

the right being greater than the left, and irritability over the median nerve at the wrist on

percussion and compression with positive Tinel and Phalen's tests.  (Id. at 219.)  There was

also tenderness along the carpal canal palmarly, but without significant instability or

mechanical symptoms such as crepitus, locking, or triggering. (Id.) Dr. Fernandez diagnosed

bilateral carpal tunnel syndrome, with the right wrist being worse than the left wrist. (Id.)

He restricted Douglass to light work entailing lifting twenty pounds occasionally, ten pounds

frequently, and negligible force constantly. (Id. at 223.) She was also limited to repetitive

pushing, pulling, twisting, gripping, and pinching occasionally, which meant she could

perform these tasks once every ten minutes and for a total of one to three hours. (Id.)

In December 2004, Dr. Jason Franklin, an osteopathic doctor, evaluated Douglass for

bilateral hand pain and numbness. (A.R. 415.) She stated that a year and a half earlier, she

noticed problems with neck and shoulder pain, and pain in her hands and arms as well

numbness and tingling in her hands. (Id.) Douglass experienced pain that was aching,

burning, or squeezing, in her neck, radiating into her arms. (Id.) Her pain was worse when

she used her hands and she used anti-inflammatory and pain medications as well as splints.

(Id.) Dr. Franklin diagnosed bilateral carpal tunnel syndrome and ordered an EMG of the left

wrist. (Id.) That same month, Douglass underwent right carpal tunnel syndrome release and

right trigger thumb release surgery. (Id. at 409-10.) Two months later, in February 2005,

Douglass underwent left carpal tunnel release and left trigger finger release surgery. (Id. at

396-97.)

In March 2005, Douglass told Dr. Rezin she was unable to return to work. (A.R. 391.)

Dr. Rezin examined Douglass and found she did not have any trigger thumb problems, but

had little crepitants in the interphalangeal joint of both thumbs. (Id.) Her grip strength was

fair and her range of motion was good. (Id.) Dr. Rezin recommended that Douglass continue

physical therapy for another week and a half, after which, he would release her to light duty work.  (Id.)  Douglass saw Dr. Rezin for a follow-up appointment regarding her bilateral carpal tunnel surgeries in April 2005.  (Id. at 385, 387.)  Dr. Rezin noted that she was no longer having numbness and tingling in her hands, and had recently returned to work.  (Id. at 385.)  Dr. Rezin indicated Douglass was capable of doing light duty work through May 1, 2005, that she would reach maximal medical improvement by May 2, 2005, that she would return to full duty work with no restrictions, and that she would be released from his care and seen on an as needed basis.  (Id.)

## B.    Mental Impairments

In November 2004, Douglass initially sought treatment for depression with Dr. Yung Chung, a psychiatrist.  (A.R. 153-58.)  One month later, Douglass reported to Dr. Chung that she felt "overwhelmed and depressed."  (Id. at 124.)  Dr. Chung diagnosed Douglass as having a depressive disorder not otherwise specified, prescribed Remeron, and noted she was taking Methadone for pain.  (Id. at 124-25.)  Douglass continued to be treated by Dr. Chung in 2005 and 2006, and also attended group therapy during this period.  (Id. at 127-28, 139-52.)

Douglass next sought psychiatric treatment at North Central Behavioral Health Systems, Inc. ("NCBHS") in October 2006.  (A.R. 498-533.)  Dr. Sheth Atul, a psychiatrist, diagnosed Douglass with depression, post-traumatic stress disorder ("PTSD") and mood disorder not otherwise specified.  (Id. at 499, 501, 505-06, 508.)  At that time, Douglass

reported having difficulty dealing with physical, financial, and family issues. (Id. at 506, 508.) Dr. Atul recommended that Douglass attend individual therapy sessions. (Id. at 506.) She was taking Buspar for anxiety, Remeron, and Cymbalta for depression. (Id. at 507, 508.)

Douglass continued her treatment with NCBHS through August 2007, at which time her case was closed due to noncompliance. (A.R. 479-542, 594.) During that period, she had continuous individual therapy, group therapy, medication monitoring, and psychiatric services. (Id.) Progress notes indicate Douglass had good and bad days, and had bouts of depression and sadness at times over certain events in her life, including her daughter's tragic death in 2007. (Id. at 486.) Her treatment objectives included working on managing her depression, PTSD, anxiety, mood problems, and seeing the doctor for her medications. (Id. at 479, 485.) She reported being in severe pain, running out of her pain medications, and losing her medical card. (Id. 535, 486.)

In March 2008, Douglass once again sought treatment from NCBHS. (A.R. 577-95.) At that time, she described a number of problems, including a depressed mood, crying spells, social withdrawal, loss of energy, changes in sleep patterns, anxiety exacerbated by ongoing physical pain, and unresolved grief over the loss of her daughter. (Id. at 577-78.) Progress notes indicate Douglass had stopped participating in NCBHS treatment in 2007 because of transportation problems. (Id. at 578.)

In May 2008, Douglass reported she was depressed and believed her depression had worsened due to untreated physical pain and continuing difficulties over the loss of her

daughter. (A.R. 605.) Treatment notes indicate she had stopped seeking treatment for her back pain because she did not have any health insurance, and her severe pain seemed to underlie all of her current problems. (Id.) She was prescribed Trazodone and Citalopram for depression and sleep disturbances. (Id. at 615-16.)

## C.    Douglass's Testimony

At the administrative hearing, Douglass testified that she stopped working at the end of October 2003, due to carpal tunnel and trigger thumb syndrome, and neck, hip, leg, and back pain. (A.R. 641, 644.) Douglass stated she collected benefits on a workers' compensation claim for her carpal tunnel and trigger thumb syndrome. (Id. at 640-42.) She indicated she had not worked for quite a while due to her conditions and the last time she worked was for about a four or five week period in May 2005, until the company closed. (Id. at 643.)

When Douglass worked on a regular basis, she held a job as a lead scale worker at Illinois Laundry. (A.R. 85, 113, 644.) Her duties entailed pushing, pulling, and maneuvering large carts of laundry material onto large floor scales, and cataloging the contents of the carts. (Id. at 218, 674-75.) She stated an empty cart weighed approximately 150 to 160 pounds, and a full cart weighed 400 to 550 pounds. (Id.) Douglass estimated she maneuvered at least 75 carts per day. (Id. at 218.) Her duties also included shrink-wrapping items in plastic, which entailed bending over, pulling the plastic out of a container, wrapping the items, sealing them, and weighing them. (Id. at 675.) While performing these duties, she

experienced "extreme pain" in her neck, lower back, left leg, hip, and hands, and she also suffered from headaches. (Id. at 644.) When Douglass returned to work for a four to five week period in May 2005, she performed different, fewer, and easier duties than she had in previous role as a lead scale worker. (Id. at 73.)

Douglass testified that she had not taken her medications, including Trazodone and Citalopram, for two weeks prior to the hearing because she did not have money to buy them and because she and her son no longer qualified for Medicaid. (A.R. 645-47.) Douglass stated her son, who provided her with financial support, would sometimes purchase her medication. (Id. at 645, 661.) She testified that she felt slightly better when she took the medication. (Id. at 646-47.) She remembered taking pain medication prescribed by Drs. Kalra and Pilar-Estilo in either 2005 or 2006. (Id. at 647.) She further indicated that when she previously took her medication, it made her feel very drowsy in the morning and, as a result, she would need to take two to three naps during the day. (Id. at 648.)

She explained that her carpal tunnel syndrome, neck and back pain, depression, PTSD, and anxiety caused certain limitations that precluded her from working. (A.R. 649-50.) She testified she could not pull or push easily. (Id at 650.) For example, Douglass indicated she had difficulty with opening an outside storm door because it was hard for her to pull, but she was able to open a normal bathroom or bedroom door. (Id. at 650-51.) She also had difficulty opening office building doors, but could open a car door. (Id. at 651.)

Next, Douglass stated that she was limited in what she could do because of her severe neck and back pain. (A.R. 652.) She indicated she could not stand in one spot for very long, and had to move around, sit down, or lay down. (Id.) Douglass testified, for example, that she could only stand for two or three minutes at a time. (Id.) She could only wash five or six dishes at a time because she has pain standing. (Id. at 653, 664.) It was hard for Douglass to lift her arms above her shoulders to brush her hair because she felt a pulling sensation along the top of her arms that caused pain. (Id. at 652-53.) Douglass, however, was able to use her hands and arms if they were positioned below her shoulders and waist area. (Id. at 654.)

She testified that she had limitations in walking. (A.R. 655.) She had difficulty walking half a block due to lower back and buttock pain. (Id.) She was unable to lift a gallon of milk because of her neck and back pain, but could lift a half gallon of milk with two hands when required. (Id. at 656.) When bending over and picking something up, Douglass testified she would need to lean on something and would have a lot of pain. (Id.)

Douglass further explained she had difficulty with personal hygiene and it took her one to two hours to take a bath. (A.R. 660.) She had back pain when getting into and out of the bath tub, and when dressing herself. (Id. at 660-61.) Douglass stated she used to bathe twice a week, but was only bathing once a week because of the extreme pain she had in her neck, back, and arms from lowering and lifting herself in and out of the bath tub. (Id. at 670.)

She testified she smoked about half a pack to a pack of cigarettes a day, when she had them.  (A.R. 661, 670-71.)  Her son, who provided her financial support, would buy her a "pack of cigarettes now and then."  (Id. at 661-62.)  She testified that, during the month before the hearing, her son bought her "[m]aybe six, seven" packs of cigarettes.  (Id. at 671.)

Douglass stated she was not able to perform household chores.  (A.R. 663-64.)  For example, she could not make her bed, vacuum, grocery shop, or do laundry.  (Id.)  She stated her son and a family friend would do the grocery shopping, and her son did the laundry as she was unable to lift it.  (Id.)  Regarding meal preparation, she was only able to prepare simple meals using a microwave oven.  (Id. at 663.)

With regard to her social activities, Douglass indicated her friends visited her approximately twice a week, and she would visit her sister twice a year.  (A.R. 664.)  She, however, did not like being around other people because she was in pain all of the time.  (Id. at 666.)  Douglass did not belong to any clubs or organizations and did not attend church.  (Id. at 664-65.)  She watched television about two to three hours each day, and read about fifteen minutes once or twice a week.  (Id. at 665.)  Douglass last drove about a month before the hearing when she went to her attorney's office.  (Id. at 659-60.)

Douglass testified she had difficulty with concentration, memory, and associating with other people.  (A.R. 658-59.)  She explained that her problems with concentration and memory impacted her ability to keep appointments.  (Id. at 672.)  Sometimes, she arrived for an appointment on the wrong day or at the wrong time.  (Id.)  Douglass's memory problems

also caused her to let the water run in the sink causing it to overflow. (Id. at 671.) She stated she had anxiety and she once went to the emergency room because of chest pain and a racing heart. (Id. at 673.) Furthermore, she explained she experienced PTSD as a result of her mother's death in 2005, because it brought back memories of violence and abuse she endured as a child, and because of her daughter's violent death in a car accident in 2007. (Id. at 667.)

Next, she stated that she frequently cried and lacked energy because she suffered from depression. (A.R. 667-68.) Douglass would sometimes stay in bed for three to four days at a time and not take care of herself. (Id. at 668.) The last time she stayed in bed for that length of time was about four months before the hearing. (Id.) Douglass testified her depression precluded her from attending to important matters. (Id.) She stated she was told by her psychiatrist she had a condition called dysthymia (chronic mood disorder) which would likely lead to a diagnosis of bipolar disorder. (Id. at 669.) She explained that such a diagnosis would explain why she would feel pretty good for a while and then a few hours later she would either need to lay down or would be moping around. (Id.)

Douglass stated that she still had numbness and tingling in her hands as well as problems with trigger thumbs, which were her biggest problems. (A.R. 677.) Her thumbs hurt and popped all of the time, and affected her ability to pick up or hold things. (Id.) Douglass dropped things all the time, could not use a can opener, and had difficulty picking up small things. (Id. at 677-78.) She explained she had neck pain everyday. (Id. at 679.)

Her pain made the back of her shoulders and top of her arms sore, and she lost strength in her arms. (Id. at 680.) She also had at least one headache each day due to her neck pain. (Id.)

Finally, Douglass testified that during a typical day, she would often lay down or sleep on and off for four to five hours due to her pain, and use a heating pad. (A.R. 681.) Her overall pain level was seven to nine out of ten on an average or bad day, and was five out of ten on a good day. (Id. at 683.) She only has about two or three good days in a month. (Id.)

## D.    Spencer's Testimony

Spencer, a family friend, testified on behalf of Douglass. (A.R. 689-92.) He stated that he saw Douglass every day and corroborated that she was constantly in pain. (Id. at 689.) Spencer saw Douglass try to wash dishes and noticed she would have to sit down after standing for about ten minutes, or go into her bedroom to use a heating pad. (Id. at 689-90.) Spencer testified that Douglass had difficulty lifting objects, sitting, and standing. (Id. at 690.) He typically did the grocery shopping for Douglass. (Id.) If Douglass did go to the grocery store, Spencer would take her and do all of the reaching, grabbing, and carrying of the groceries. (Id. at 690-91.) He indicated he noticed Douglass having problems with her hands because she was always rubbing her thumbs, and was tearful due to her constant pain. (Id. at 691.) Spencer stated the heaviest object Douglass could lift was her purse and her pain limited her to very basic cleaning of her house. (Id. at 691-92.)

**E.      Gustafson's Testimony**

Gustafson, a VE, testified that Douglass could not perform her past work as it included medium level work and involved more than occasional stooping. (A.R. 685.) The ALJ asked Gustafson whether a hypothetical person of Douglass's age, education and work experience, but who is limited to light exertional work, moderately complex or detailed tasks, occasional contact with the public, coworkers, and supervisors, and has limited overhead reaching abilities and occasional postural activities could perform any work. (Id.) Gustafson answered that such an individual could perform manufacturing and housekeeping cleaning jobs. (Id.) There were about 14,000 light work jobs in the State of Illinois and examples of such jobs included hotel room cleaners and office cleaners. (Id. at 685-86.) Gustafson also testified that if the residual functional capacity ("RFC") was reduced to simple, routine work, that would not change the types of available jobs. (Id. at 686.)

The ALJ next altered the hypothetical and asked Gustafson if there were any jobs the hypothetical person could perform if the work entailed sedentary work, including lifting up to ten pounds occasionally; less than ten pounds frequently; negligible weight occasionally; sitting a total of eight hours in a day; standing for no more than two hours in a day; with moderately complex or detailed tasks; occasional contact with the public, coworkers, and supervisors; occasional overhead reaching; and occasional postural activities. (A.R. 686.) Gustafson indicated that such an individual could perform manufacturing jobs. (Id. at 687.) Some examples of these jobs include packaging and filling machine operators (360 jobs),

17

production inspection (470 jobs), production workers (1,800 jobs), and industrial laborer in material handling (3,500 jobs). (Id.) Gustafson further testified that if the hypothetical posed by the ALJ was altered for simple, routine work activity, none of these jobs would be eliminated. (Id.)

Finally, the ALJ asked Gustafson what would happen to the job base if fine hand manipulation was limited to frequent, and he responded that the number of jobs would be eliminated by one-third. (A.R. 687-88.) However, Gustafson stated that if an individual was less than eighty percent productive on the job, that would rule out any job over time because that individual would eventually lose the job due to inadequate productivity. (Id. at 688.)

## F.     The ALJ's Decision

The ALJ issued a decision finding that Douglass was not disabled within the meaning of the Act. (A.R. 23.) The ALJ found that Douglass had at least a high school education[3] and was defined as a younger individual because she was forty-four years old, as of the alleged onset date of her disability, October 29, 2003. (Id. at 21.) The ALJ initially determined that Douglass had met the insured status requirements under the Act through

---

[3] The ALJ incorrectly found that Douglass had at least a high school education. (A.R. 21.) At the hearing, Douglass testified that she completed the eighth grade, but never obtained a general equivalency diploma. (Id. at 642.) In the responsive brief, the Commissioner points out that the ALJ's error is harmless because the application of Grid Rule 202.17, which refers to a person of limited education, produces a finding of "not disabled." Douglass does not dispute this in her reply brief.

December 31, 2008. (Id. at 13.) Next, the ALJ found that Douglass had not engaged in substantial gainful activity since the alleged onset date of her disability. (Id.)

The ALJ found that the medical evidence established Douglass suffered from severe impairments, including a back disorder, depression, and PTSD. (A.R. 13.) However, the ALJ determined that Douglass did not have an impairment or combination of impairments listed in, or medically equal to one listed in 20 C.F.R. § 404, Subpt. P, App.1. (Id.) The ALJ then assessed Douglass's RFC to determine what work she could perform despite her limitations. (Id. at 15-21.) The ALJ found that Douglass could perform light work limited to work activity involving only occasional overhead reaching, and only occasional postural activities. (Id. at 15.) The ALJ further found that, as a result of Douglass's depression and bipolar disorder, she was limited to moderately complex or detailed tasks, and limited to only occasional contact with the public, co-workers, or supervisors. (Id.)

In reaching this conclusion, the ALJ discussed Douglass's extensive medical history and agreed that her impairments could reasonably be expected to cause the alleged symptoms. (A.R. 16-21.) However, the ALJ decided Douglass lacked credibility with regard to her description of the intensity, persistence, and limiting effects of those symptoms. (Id. at 16-17.) In the ALJ's view, Douglass lacked credibility because the medical record was "not wholly consistent" with her claims of disabling symptoms. Additionally, the ALJ found Douglass's claims of disabling symptoms not credible because she: (1) engaged in an array of daily activities; (2) failed to comply with prescribed medical treatment, including taking

prescription medications; (3) purchased cigarettes rather than medication; (4) stopped working in 2005, due to a business-related layoff (and produced no evidence that showed her condition had deteriorated since the layoff); and (5) was released to return to work by one of her treating doctors. (Id. at 17.)

The ALJ next found that Douglass was unable to perform her past relevant work. (A.R. 21.) He determined, however, notwithstanding Douglass's limitations, that a significant number of jobs existed in the national economy that she could perform. (Id. at 22.)

## Analysis

Douglass is entitled to a remand because the ALJ failed to explain how the medical evidence was inconsistent with her disabling condition, and the ALJ's reasons regarding her credibility are not supported by the record.

## A.    Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one: the court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The court may not reevaluate the facts, reweigh the evidence, or substitute its judgment for that of the Social Security Administration. *Binion on Behalf of Binion v. Chater*, 108 F.3d 780, 782 (7th Cir.

1997).  Where conflicting evidence would allow reasonable minds to differ as to whether a plaintiff is disabled, the Commissioner has the responsibility for resolving those conflicts. *Id.*  Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the evidence supporting the factual findings.  *Id.*

While the standard of review is deferential, the court "must do more than merely rubber stamp" the Commissioner's decision.  *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (citations omitted).  In order for the court to affirm a denial of benefits, the ALJ must have "articulated" the reasons for the decision at "some minimum level."  *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  This means that the ALJ "must build an accurate and logical bridge from the evidence to [the] conclusion."  *Id.*  Although an ALJ need not address every piece of evidence, the ALJ cannot limit his decision to only that evidence that supports his ultimate conclusion.  *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).  The ALJ's decision must allow the court to assess the validity of his findings and afford the plaintiff a meaningful judicial review.  *Scott*, 297 F.3d at 595.

## B.    Five-Step Inquiry

To qualify for DIB and SSI under Titles II and XVI, a claimant must establish that she has a "disability" within the meaning of the Act.[4]  42 U.S.C. §§ 423(a)(1)(D), 1382(a).  An

---

[4]  The regulations governing the determination of disability for DIB are set forth at 20 C.F.R. § 404.1501 *et seq.*  The SSI regulations, which are nearly identical to the DIB regulations, are found at 20 C.F.R. § 416.901 *et seq.*

individual is "disabled" if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a); *Skinner v. Astrue*, 478 F.3d 836, 844 (7th Cir. 2007). The Social Security regulations set forth a five-step sequential inquiry for determining whether a claimant is disabled. The ALJ must consider whether:

> (1) the claimant is presently [un]employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity leaves [her] unable to perform [her] past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy.

*Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005) (citing 20 C.F.R. § 404.1520).

An affirmative answer to each step leads either to the next step or, at steps 3 and 5, to a finding that the claimant is disabled within the meaning of the Act. 20 C.F.R. § 404.1520; *Briscoe*, 425 F.3d at 352. A negative answer at any point, other than step 3, terminates the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. § 404.1520; *Stein v. Sullivan*, 892 F.2d 43, 44 (7th Cir. 1989). The claimant bears the burden of proof through step four. *Briscoe*, 425 F.3d at 352. And, if all four steps are met, the burden shifts to the Commissioner at step five. *Id.* The Commissioner must then

establish that the claimant -- in light of her age, education, job experience and RFC to work -- is capable of performing other work and that such work exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1520(f).

## C.    Credibility Finding

Douglass brings several challenges to the ALJ's decision that she was not disabled as of October 29, 2003.  She first contends that the record lacks substantial evidence to support the ALJ's finding that her complaints and limitations pertaining to her pain and mental impairments are not credible.  (Pl.'s Mem. at 8-12.)  Douglass also contends that the ALJ's hypothetical questions to the VE either support a finding of disability or were deficient.[5]  (Id. at 12-13.)  The Commissioner, on the other hand, contends that the ALJ's decision is supported by substantial evidence and that he correctly found that Douglass is capable of performing light work with certain stated limitations.  (Def.'s Mem. at 7-9.)  The Commissioner also contends that the record contains two medical opinions that are consistent with the ALJ's RFC finding that Douglass is capable of performing light work.  (Id.)

The court agrees with Douglass that the ALJ erred in his credibility assessment of her testimony at the hearing and that a remand on this issue is required. An ALJ's credibility finding will be afforded "considerable deference" and overturned only if it is "patently

---

[5]  In her memorandum and reply, Douglass failed to sufficiently develop this argument to allow for meaningful judicial review.  Accordingly, the Court considers this argument waived.  *See United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.")

wrong." *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) (citations omitted). "A credibility assessment is afforded special deference because an ALJ is in the best position to see and hear the witness and determine credibility." *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000) (citation omitted). However, where the credibility determination is based on objective factors rather than subjective considerations, an ALJ is in no better position than the court and the court has greater freedom to review it. *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008). Social Security Ruling ("SSR") 96-7p instructs that the ALJ's written decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186, at *2; *Brindisi v. Barnhart,* 315 F.3d 783, 787 (7th Cir. 2003).

In the context of assessing testimony of pain, once it is established that the claimant has a medically determinable impairment that could reasonably be expected to produce the alleged disabling symptoms, an ALJ is required to evaluate the claimant's subjective complaints of pain, by considering the objective medical evidence and any additional information provided by the claimant, physicians, or others. 20 C.F.R. § 404.1529. If a claimant's allegations of pain are not supported by objective medical evidence, an ALJ must evaluate pain by looking to a number of other factors to determine credibility, including daily activities, information and observations made by treating and examining physicians,

precipitating and aggravating factors, dosage and effectiveness of pain medication, functional restrictions, and other treatment for pain relief. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001) (citation omitted). Therefore, an ALJ may not "discredit the claimant's testimony as to subjective symptoms merely because they are unsupported by objective [medical] evidence." *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004) (citations omitted).

Here, the ALJ found that Douglass's statements concerning the intensity, persistence, and limiting effects of her symptoms were not credible to the extent they conflicted with the medical records and RFC determination. (A.R. 17-18.) Additionally, the ALJ viewed Douglass's allegations of disabling symptoms as not credible because she: (1) engaged in an array of daily activities; (2) failed to comply with prescribed medical treatment, including taking prescription medications; (3) purchased cigarettes rather than medication; (4) stopped working in 2005, due to a business-related layoff (and produced no evidence that showed her condition had deteriorated since the layoff); and (5) was released to return to work by one of her treating doctors.

1. **Medical History**

The ALJ found Douglass not credible because "the medical record is not wholly consistent with the claimant's allegations of disabling symptoms." (A.R. 17.) The ALJ then listed many of Douglass's medical records, but he failed to provide any insight into how he evaluated those records. The court's review of the record shows that the medical evidence supports Douglass's pain allegations and establishes she suffers from a myriad of physical

and mental impairments. For example, Douglass's back pain is substantiated by objective medical testing, which shows: (1) a central to right posterolateral C5-C6 herniated disc, and partial left C5-C6 postarthritic neuroforaminal stenosis secondary to osteoarthrosis (A.R. 18, 368); (2) right mid to lower thoracic spine degenerative joint disease with an incidental finding of a moderate to large sized C5-C6 disc protrusion, with possible cord impingement, signifying a herniated disc and a smaller disc protrusion at C6-C7 (id. at 19, 373-74); (3) mild to moderate lumbar spondylosis with moderate to severe L5-S1 disc degeneration (id. at 20, 245); (4) a posterior disc bulge at C5-C6 with narrowing of the spinal canal down to 7.4 millimeters and flattening of the spinal cord, and partial left neuroforaminal narrowing at C5-C6 (id. at 20, 233-34); and (5) central canal stenosis at L2-L3, and marked narrowing of the left neural foramen at L3-L4 (id. at 116). Additionally, a November 3, 2003, handwritten note on an x-ray evaluation of Douglass's pelvis and left hip, states her pain is coming from the L5-S1 level, where incidentally "severe degenerative changes at the L5-S1 level" are noted. (Id. at 122.)

Furthermore, the medical record in this case establishes that Douglass sought extensive treatment for her severe neck, back, and hip pain over a four-year period, which included diagnostic tests, lumbar epidural steroid injections, physical therapy, TENS and IDD therapy, and narcotic pain medications. (A.R. 116, 122, 185, 211, 213, 233-34, 235, 237-39, 255, 257-58, 259-60, 243-44, 245, 261-62, 263, 271, 303, 308, 310, 348, 357-58, 359, 361, 363-65, 368, 373, 376-77, 456-57, 463-68, 546, 563, 565.) There is also ample

evidence in the medical record supporting Douglass's other physical pain and limitations associated with her hands, which included bilateral carpal tunnel release and trigger thumb release surgery. (Id. at 178-82, 216-28, 280-81, 385, 387-88, 391, 401-03, 405, 408-10, 414, 415, 417-18, 420, 430, 438.)

Finally, there is sufficient record evidence demonstrating that Douglass suffered from depression, PTSD, and anxiety from 2004 through 2008. (A.R. 124-28, 139-52, 153-58, 479-542, 577-95, 605, 615-16.) Her treatment included individual therapy, group therapy, psychiatric care, and medication. (Id.)

At the hearing, Douglass testified that her overall pain level was seven to nine out of ten on an average or bad day, and was five out of ten on a good day. (A.R. 683.) She only has about two or three good days in a month. (Id.) Douglass explained that during a typical day she would often lay down or sleep on and off for four to five hours due to pain, and also used a heating pad. (Id. at 681.) She indicated she could not walk more than half a block, had difficulty with personal hygiene, and could not do household chores because of her severe pain. (Id. at 655, 660, 663-64.) Douglass further testified that she suffered from depression and PTSD and had problems with concentration, memory, and associating with other people. (Id. at 658-59, 667-68.)

The ALJ overlooked ample evidence corroborating Douglass's claims of severe pain and mental limitations, and did not explain why the medical evidence was inconsistent with the level of pain and limitation Douglass described. It is not enough for the ALJ to simply

recite the medical record in the case without any discussion of the weight he gave to the evidence. Accordingly, the ALJ's conclusory finding that the medical evidence was not "wholly consistent" with Douglass's allegations of disabling symptoms lacks the specificity needed to permit a meaningful review by a court. *Zurawski*, 245 F.3d 887-88; *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000) (an ALJ "must minimally articulate his reasons for crediting or rejecting evidence of disability"); *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004) (an ALJ may not "discredit the claimant's testimony as to subjective symptoms merely because they are unsupported by objective [medical] evidence").

### 2. Daily Activities

The ALJ found that Douglass lacked credibility because she is "able to engage in an array of daily activities." (A.R. 14, 17.) The ALJ determined that Douglass is able to care for her own personal hygiene, prepare simple meals, make a pot of coffee, dust, wash dishes, drive to legal and medical appointments, watch television for two to three hours each day, read a few times a week, visit with family and friends, and grocery shop. (Id. at 14.)

The ALJ's reliance on these daily activities is misplaced because he mischaracterized most of Douglass's testimony regarding them. For example, while the ALJ found that Douglass could grocery shop, she actually testified she could not grocery shop, and that her son and Spencer would do the grocery shopping for her. (A.R. 663-64.) Douglass further explained that when she did go to the grocery store, Spencer would take her and do all of the reaching, grabbing, and carrying of the groceries. (Id. at 690-91.) Next, the ALJ found that

28

Douglass was capable of caring for her own personal hygiene. (Id. at 14.) However, Douglass testified that she has difficulty with personal hygiene and it took her one to two hours just to take a bath. (Id. at 660.) She stated that she used to bathe twice a week, but was only bathing once a week because of the extreme pain she had in her neck, back, and arms from lowering and lifting herself in and out of the bath tub. (Id. at 660-61, 670.) Douglass also explained that she had difficulty brushing her hair because she had to lift her arms above her shoulders, which caused a pulling sensation along the top of her arms causing pain. (Id. at 652-53.)

The ALJ further mischaracterized Douglass's testimony regarding her ability to perform household chores, attend medical and legal appointments, and visit with family and friends. Douglass testified she was not able to do household chores; she could not make her bed, vacuum, or do laundry. (A.R. 663-64.) She explained that her son did the laundry because she could not lift it. (Id.) Douglass stated she could only wash five or six dishes at a time because she has pain standing and could only stand for two or three minutes at a time. (Id. at 652-53, 664.) With respect to Douglass's ability to attend legal and medical appointments, she testified that, due to her difficulty with concentration and memory, she often missed appointments and arrived for an appointment on the wrong day or at the wrong time. (Id. at 672.) Finally, Douglass explained that while friends visited her approximately twice per week, she did not like being around people because she was in pain all of the time. (Id. at 664, 666.)

Next, after mischaracterizing Douglass's testimony, the ALJ improperly determined that Douglass's ability to perform limited and restricted daily activities was consistent with her ability to perform work-related activities. In *Zurawski*, a claimant's ability to wash dishes, help children prepare for school, do laundry, and prepare dinner were "fairly restricted" activities that did not necessarily undermine a claim of disabling pain. 245 F.3d at 887. Similarly, in *Clifford*, the daily activities of a claimant who was able to perform household chores (lasting for two hours and punctuated by rest), cook simple meals, go grocery shopping three times per month, and sometimes carry groceries from her car to her apartment were characterized as minimal and were not inconsistent with her claims of disabling pain. 227 F.3d at 872. Here, Douglass testified in detail about how her pain limited her daily activities, and there is nothing contradicting her testimony. Furthermore, as discussed *supra*, the objective medical evidence, in large part, substantiates her physical and mental limitations.

### 3. Medical Treatment

The ALJ found Douglass's allegations of disabling symptoms not credible because she "has not been entirely compliant in taking prescribed medications and following medical advice, which suggests that the symptoms may not have been as limiting as the claimant has alleged in connection with this application." (A.R. 17.) In support of the ALJ's finding, the Commissioner contends that the record is replete with Douglass's failure to follow through

on treatment recommendations. (Def.'s Resp. at 10.) The ALJ's finding is not supported by the record.

Regarding Douglass's medical treatment, SSR 96-7p provides in pertinent part:

[T]he adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment. The adjudicator may need to recontact the individual or question the individual at the administrative hearing in order to determine whether there are good reasons the individual does not seek medical treatment or does not pursue treatment in a consistent manner. The explanations provided by the individual may provide insight into the individual's credibility.

1996 WL 374186, at *7. SSR 96-7p also sets forth examples for why a claimant may choose not to seek medical treatment, including the explanation that "the individual may be unable to afford treatment and may not have access to free or low-cost medical services." *Id.* at *8. Accordingly, even though a claimant's failure to seek medical treatment may be inconsistent with a claim of disabling impairments, an ALJ "must not draw any inferences about a claimant's condition from this failure unless the ALJ has explored the claimant's explanations as to the lack of medical care." *Craft*, 539 F.3d at 679.

As discussed *supra*, the medical evidence in this case establishes that Douglass sought extensive treatment for her physical and mental impairments, including severe neck, leg, hip, and back pain, as well as depression, PTSD, and anxiety. While the ALJ correctly noted that Douglass was "not entirely compliant in taking prescribed medications and following medical advice," in the few instances where Douglass failed to follow through with

31

treatment, she offered explanations for her failure. For example, Douglass testified that she had been out of medication for a long time because she did not have medical insurance, money, or a state medical card. (A.R. 642, 646-47.) She also explained that when her son turned 19, they both lost coverage under Medicaid. (Id. at 647.) Therefore, at certain times, Douglass was unable to afford her medication. It is impossible, however, to tell from the ALJ's decision whether he considered this explanation.

Next, with respect to her mental health treatment, NCBHS medical records indicate Douglass missed some of her appointments because she had problems with her 20-year old truck. (A.R. 578, 600, 605.) In fact, in August 2007, Douglass stopped her treatment with NCBHS because of problems with her truck. (Id. at 578, 605.) Even after she was able to resume her mental health treatment with NCBHS, treatment notes indicate that she was anxious about making medical appointments and struggled to keep them because of her ongoing transportation problem. (Id. at 600.) Once again, the ALJ failed to discuss this legitimate explanation for Douglass's missed appointments, and this court cannot tell whether he considered it at all.

Furthermore, the ALJ failed to consider Douglass's mental impairments when evaluating her lack of compliance with medical treatment. The Seventh Circuit has recognized that "mental illness in general and bipolar disorder in particular . . . may prevent the sufferer from taking her prescribed medications or otherwise submitting to treatment." *Kangail v. Barnhart*, 454 F.3d 627, 630 (7th Cir. 2006) (citations omitted). Here, the ALJ

did not consider whether Douglass, who he found had been diagnosed with bipolar disorder, may not have been compliant with taking her medications and pursuing treatment due to her mental illness.  *See Wadsworth v. Astrue*, No. 07-cv-0832, 2008 WL 2857326, at * 8 (S.D. Ind. July 21, 2008) (credibility finding reversed where the ALJ concluded that "the claimant has not generally received the type of medical treatment one would expect for a totally disabled individual").

### 4.    Medications

The record does not support the ALJ's finding that Douglass lacked credibility because her son purchased cigarettes for her instead of medication.  (A.R. 17.)  In his decision, the ALJ stated:

> The claimant testified there have been long periods where she has gone without medications due to lack of finances.  Despite this, the claimant testified she has continued to smoke throughout the entire period at issue. During examination by the undersigned, the claimant testified she smokes one-half pack to one pack of cigarettes per day.  She testified her son buys her the cigarettes.  The undersigned finds this testimony without credibility where the family can afford cigarettes but not medications.  Under cross-examination by her attorney, the claimant modified her testimony, and testified she only smokes when she has cigarettes, and does not have cigarettes everyday.

(Id.)

Here, the ALJ mischaracterizes Douglass's testimony when he found she continued to smoke instead of taking her medications.  Douglass testified that she smokes about half a pack to a pack of cigarettes a day, when she has them, and her son would buy her a "pack of cigarettes now and then."  (A.R. 661-62, 670-71.)  She further explained that, during the

33

month before the hearing, her son bought her "[m]aybe six, seven" packs of cigarettes. (Id. at 671.) Therefore, the ALJ improperly linked the purchase of cigarettes with Douglass's choice not to take her medication.

### 5. Layoff

The ALJ further based his negative credibility finding on the fact that Douglass returned to work for about a four or five week period in May 2005. Shortly after Douglass returned to work, she was laid off because the company closed. The ALJ stated:

> The claimant stopped working in 2005 due to a business-related layoff rather than because of the alleged disabling impairments. Further, there is no evidence of a significant deterioration in the clamant's medical condition since that layoff. A reasonable inference, therefore, is that the claimant's impairments would not prevent the performance of that job, since it was being performed adequately at the time of the layoff despite a similar medical condition.

(A.R. 17.)

However, when Douglass returned to work, she had different, fewer, or easier duties. (A.R. 74.) Additionally, during that period, her hours varied from 20 to 37 hours each week. (Id. at 72.) While the ALJ properly found that Douglass stopped working in 2005 due to a layoff, he incorrectly evaluated her duties and assumed they remained unchanged from her prior work with the same company. Also, the record does not support the ALJ's finding that Douglass was adequately performing her duties at the time she was laid off.

### 6.     Work Release

Next, the ALJ discredited Douglass's allegations of disabling pain because the record "contains a statement from one of the claimant's doctors releasing the claimant to return to work." (A.R. 17.)  The ALJ relied on an April 19, 2005, statement from Dr. Rezin, releasing Douglass to return to light duty work, and then to full duty work, with no restrictions.  (Id. at 385.)  The Commissioner avers Dr. Rezin is the only doctor who offered an opinion about Douglass's ability to work and "[s]ignificantly that opinion is consistent with the ALJ's RFC finding."  (Def.'s Resp. at 11.)

While the ALJ is correct that Dr. Rezin released Douglass to return to work, Dr. Rezin's statement pertained only to her bilateral carpal tunnel syndrome and trigger thumb problems.  Dr. Rezin's statement did not take into account Douglass's neck, hip, leg, and back pain or her mental limitations.  Dr. Rezin specifically noted that he would not be involved in Douglass's neck and back issues.  (A.R. 430.)  Therefore, the ALJ improperly relied on Dr. Rezin's statement because it did not incorporate all of Douglass's limitations.

## Conclusion

For the foregoing reasons, Douglass's motion for summary judgment is granted and this case is remanded to the Commissioner for further proceedings consistent with this Memorandum Opinion and Order.

ENTER:

_____
**Young B. Kim**
**United States Magistrate Judge**